Evan J. Smith (SBN242352)
BRODSKY & SMITH, LLC
9595 Wilshire Boulevard, Suite 900
Beverly Hills, CA 90212
Telephone:     (877) 534-2590
Facsimile:     (310) 247-0160
esmith@brodskysmith.com

*Attorneys for Plaintiffs*
_____

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHEL DE LETTER AND ELIZABETH DE LETTER, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>ULTRATECH INC., ARTHUR W. ZAFIROPOULO, RONALD BLACK, MICHAEL CHILD, PARAMESH GOPI, BEATRIZ INFANTE, DENNIS RANEY AND HENRI RICHARD,<br><br>Defendants. | Case No.:<br><br>CLASS ACTION<br><br>CLASS ACTION COMPLAINT FOR:<br>(1) Violation of § 14(a) of the Securities Exchange Act of 1934<br>(2) Violation of § 20(a) of the Securities Exchange Act of 1934<br><br>DEMAND FOR JURY TRIAL |

Plaintiffs Michel De Letter and Elizabeth De Letter ("Plaintiffs"), by their attorneys, on behalf of themselves and those similarly situated, file this action against the defendants, and allege upon information and belief, except for those allegations that pertain to them, which are alleged upon personal knowledge, as follows:

## SUMMARY OF THE ACTION

1.      Plaintiffs bring this stockholder class action on behalf of themselves and all other public stockholders of Ultratech, Inc. ("Ultratech" or the "Company"), against Ultratech, and the Company's Board of Directors (the "Board" or the "Individual Defendants, and collectively with Ultratech, the "Defendants"), for violations of Sections 14(a) and 20(a) of the Securities and

Exchange Act of 1934 (the "Exchange Act"), and to enjoin a vote soon to be scheduled in which Veeco Instruments Inc. ("Parent") and its wholly owned subsidiary, Ulysses Acquisition Subsidiary Corp. ("Merger Sub," and together with Parent, "Veeco") will acquire each outstanding share of Ultratech common stock for $21.75 per share in cash and 0.2675 shares of Veeco stock. Based on Veeco's closing price on February 1, 2017, the day before the announcement of the Merger, the merger consideration was valued at approximately $28.64 per share of Ultratech stock (the "Proposed Acquisition").

2.     The terms of the Proposed Acquisition were memorialized in a February 3, 2017 filing with the Securities and Exchange Commission ("SEC") on Form 8-K attaching the definitive Agreement and Plan of Merger (the "Merger Agreement").

3.     On March 13, 2017, Ultratech filed a Preliminary Proxy Statement on Schedule 14A (the "Preliminary Proxy") with the Securities and Exchange Commission (the "SEC") in support of the Proposed Acquisition.

4.     In connection with the Merger Agreement, all members of the Board of Directors of the Company entered into a Voting Agreements with Veeco pursuant to which the members of the Board of Directors have agreed to vote their shares of Company common stock and to support the Merger and the other transactions contemplated by the Merger Agreement.

5.     The Proposed Acquisition undervalues Ultratech and is the result of a flawed sales process.  Post-closure, Ultratech shareholders will own only 15% of the combined companies despite accounting for approximately 37% of aggregate sales (at current levels).  Additionally, analyst coverage indicates a high target above the deal price - $30.00 per share.

6.     The process leading up to the Proposed Acquisition was also tainted by the self-interest of certain of the Individual Defendants.  According to the Preliminary Proxy, "[a]ssuming the merger was consummated on June 1, 2017 and Ultratech's directors and executive officers continue to beneficially own, in the aggregate, 926,674 shares of Ultratech common stock until such time, Ultratech's executive officers and directors will be entitled to receive an aggregate of $20,155,160 in cash, without interest and less any applicable withholding taxes, and 247,885 shares of Veeco common stock (which is valued at $6,779,655 using the closing stock price of

CLASS ACTION COMPLAINT

Veeco common stock on Nasdaq on February 28, 2017 of $27.35 per share), in the merger in exchange for those shares of Ultratech common stock.  Additionally, Defendant Arthur W. Zafiropoulo is due to receive over $8 million dollars in change of control payments if the deal is consummated.

7.     Further, pursuant to the terms of the Merger Agreement, all outstanding and unvested options to purchase Ultratech shares and all restricted stock units, will automatically vest and/or be cancelled in exchange for the Merger Consideration upon consummation of the Proposed Acquisition.  Accordingly, other company insiders including Directors and Officers stand to receive large paydays upon the consummation of the Proposed Acquisition, tainting their motivations in approving it.

8.     Finally, in violation of sections 14(a) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act"), Defendants caused to be filed a materially deficient Preliminary Proxy with the SEC in an effort to solicit stockholders to vote their Ultratech shares in favor of the Proposed Acquisition.  The Preliminary Proxy is materially deficient and deprives Ultratech stockholders of the information they need to make an intelligent, informed and rational decision of whether to vote their shares in favor of the Proposed Acquisition.  As detailed below, the Preliminary Proxy omits and/or misrepresents material information concerning, among other things: (a) the Company's financial projections; (b) the sales process of the Company; and (b) the data and inputs underlying the financial valuation analyses that purport to support the fairness opinions provided by the Company's financial advisor Merrill Lynch, Pierce, Fenner & Smith Incorporated ("BofA").

9.     Absent judicial intervention, the merger will be consummated, resulting in irreparable injury to Plaintiff and the Class.  This action seeks to enjoin the Proposed Acquisition or, in the event the Proposed Acquisition is consummated, to recover damages resulting from violation of the federal securities laws by Defendants.

CLASS ACTION COMPLAINT

**PARTIES**

10.     Plaintiffs are individual citizens of the State of Indiana.  Plaintiffs are, and at all times relevant hereto, have been Ultratech stockholders.

11.     Defendant Ultratech develops, manufactures, and markets photolithography, laser thermal processing, and inspection equipment.  It supplies step-and-repeat photolithography systems based on one-to-one imaging technology for semiconductor device and nanotechnology manufacturers.  The Company is incorporated in the state of Delaware and has a principal place of business located at 3050 Zanker Road, San Jose, California.  Ultratech common stock is publicly traded on the Nadaq under the ticker symbol "UTEK."

12.     Defendant Arthur R. Zafiropoulo ("Zafiropoulo") has served at all relevant times as Chair of the Board and CEO of the Company.

13.     Defendant Ronald Black ("Black") has been a member of the Ultratech Board of Directors at all relevant times.

14.     Defendant Michael Child ("Child") has been a member of the Ultratech Board of Directors at all relevant times and also served on the Board from 1993-1997.

15.     Defendant Paramesh Gopi ("Gopi") has been a member of the Ultratech Board of Directors at all relevant times.

16.     Defendant Beatriz Infante ("Infante") has been a member of the Ultratech Board of Directors at all relevant times.

17.     Defendant Dennis Raney ("Raney") has been a member of the Ultratech Board of Directors at all relevant times.

18.     Defendant Henri Richard ("Richard") has been a member of the Ultratech Board of Directors at all relevant times.

19.     Defendants Zafiropoulo, Black, Child, Gopi, Infante, Rany and Richard identified in ¶¶ 13-19 are collectively referred to as the "Individual Defendants."

20.     Non-Party Veeco Instruments Inc., a Delaware corporation, together with its subsidiaries, designs, develops, manufactures, markets, and supports thin film process equipment to make light emitting diodes (LEDs), micro-electromechanical systems (MEMS), power

electronics, wireless devices, hard disk drives (HDDs), and semiconductor devices worldwide. It offers metal organic chemical vapor deposition systems; precision surface processing systems; ion beam etch and deposition systems; molecular beam epitaxy systems; and other deposition and industrial products, as well as support services. Veeco sells its products to LED, MEMS, outsourced semiconductor assembly and test, HDD, and semiconductor manufacturers, as well as research centers and universities. It is headquartered at 1 Terminal Drive, Plainview, New York 11803. Its common stock is publicly traded on the NASDAQ under the symbol "VECO."

21.     Non-Party Merger Sub is a Delaware corporation created for the sole purpose of effectuating the Proposed Acquisition.

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(a) and Section 20(a) of the Exchange Act. This action is not a collusive one to confer jurisdiction on a court of the United States, which it would not otherwise have.

23.     Personal jurisdiction exists over each defendant either because the defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over defendant by this Court permissible under traditional notions of fair play and substantial justice.

24.     Venue is proper in this District pursuant to 28 U.S.C. § 1391, because Ultratech's principal place of business is located in the Northern District of California, and each of the Individual Defendants, as Company officers or directors, has extensive contacts within this District.

## CLASS ACTION ALLEGATIONS

25.     Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23, individually and on behalf of the stockholders of Ultratech common stock who are being and will be harmed by Defendants' actions described herein (the "Class"). The Class specifically excludes

Defendants herein, and any person, firm, trust, corporation or other entity related to, or affiliated with, any of the Defendants.

26.     This action is properly maintainable as a class action because:

a.   The Class is so numerous that joinder of all members is impracticable. According to the Company's most recent 10-K, as of January 27, 2017, there were more than 26 million common shares of Ultratech outstanding.  The actual number of public stockholders of Ultratech will be ascertained through discovery;

b.   There are questions of law and fact which are common to the Class, including *inter alia*, the following:

i.   Whether Defendants have violated the federal securities laws;

ii.   Whether Defendants made material misrepresentations and/or omitted material facts in the Preliminary Proxy; and

iii.   Whether Plaintiffs and the other members of the Class have and will continue to suffer irreparable injury if the Proposed Acquisition is consummated.

c.   Plaintiffs are adequate representatives of the Class, have retained competent counsel experienced in litigation of this nature and will fairly and adequately protect the interests of the Class;

d.   Plaintiffs' claims are typical of the claims of the other members of the Class and Plaintiffs do not have any interests adverse to the Class;

e.   The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class;

CLASS ACTION COMPLAINT

f.    Plaintiffs anticipate that there will be no difficulty in the management of this litigation and, thus, a class action is superior to other available methods for the fair and efficient adjudication of this controversy; and

g.    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

### SUBSTANTIVE ALLEGATIONS

*Company Background*

27.    Ultratech develops, manufactures, and markets photolithography, laser thermal processing, and inspection equipment.  It supplies step-and-repeat photolithography systems based on one-to-one imaging technology for semiconductor device and nanotechnology manufacturers. The Company is incorporated in the state of Delaware and has a principal place of business located at 3050 Zanker Road, San Jose, California.  Ultratech common stock is publicly traded on the Nadaq under the ticker symbol "UTEK."

28.    Ultratech has shown sustained solid financial performance.  For example, for the second quarter of fiscal 2016, Ultratech reported net sales of $48.9 million as compared to $45.9 million during the second quarter of fiscal 2015.  On a GAAP basis, Ultratech's net income for the second quarter of fiscal 2016 was $2.6 million, or $0.10 per share, as compared to net income of $1.5 million, or $0.06 per share, for the same quarter last year.  Defendant Zafiropoulo stated, "Second quarter revenue growth was driven by strong demand for our laser spike annealing, advanced packaging, and inspection product lines.  We continue to benefit from positive trends related to the extension of the 28-nm node and the expansion of fan-out packaging technologies to manufacture semiconductor chips.  With order momentum and positive leverage in our model, we remain well-positioned to take advantage of the current up-cycle in our industry and anticipate strong growth in the second half of 2016."

29.    Similarly, the Company continued its strong performance in the third quarter of 2016.  For example, for the third quarter of fiscal 2016, Ultratech reported net sales of $48.6 million as compared to $33.1 million during the third quarter of fiscal 2015.  On a non-GAAP

### CLASS ACTION COMPLAINT

basis, Ultratech's net income for the third quarter of fiscal 2016 was $8.0 million, or $0.29 per share, as compared to net loss of $1.3 million, or $0.05 per share, for the same quarter in 2015. Defendant Zafiropoulo stated, "Our third quarter revenues increased by 47 percent as compared with a year ago, driven by higher sales of our inspection, laser spike annealing, and advanced packaging product lines." As of October 1, 2016, the Company had $267,000,000 in cash, cash equivalents and short-term investments.

30.    On the same day as the announcement of the merger, the Company released its fourth quarter and year-end results. For the fourth quarter of fiscal 2016, Ultratech reported net sales of $51.3 million as compared to $28.2 million during the fourth quarter of fiscal 2015. For the year, its 2016 revenue of $194,000,000 was up 30% year over year and in 2016, the Company expanded its gross margins to 46%.

31.    Despite this upward trajectory and glowing pronouncements by management, success, the Individual Defendants have caused Ultratech to enter into the Proposed Acquisition with Veeco, thereby depriving Plaintiffs and other public stockholders of the Company the opportunity to reap the benefits of Ultratech's present and future success.

***The Flawed Sales Process***

32.    The process deployed by the Individual Defendants was flawed and inadequate, and conducted out of the self-interest of the Individual Defendants

33.    On July 20, 2015, the Ultratech business development committee of the Ultratech Board met with representatives of BofA, legal counsel, and Company Management to review merger and acquisition trends in Ultratech's industry sector, the landscape of potential acquisition targets, and whether there were possible strategic transactions that Ultratech could pursue to benefit its stockholders. At that time, the members of the Ultratech business development committee were Michael Child, Dennis Raney and Henri Richard.

34.    On August 4, 2015, Neuberger Berman Group LLC, a stockholder of Ultratech, on behalf of itself and other affiliated parties ("Neuberger"), sent Ultratech a letter stating, among other things, that it was disappointed with Ultratech's long-term stockholder value creation, and asked to engage Ultratech in a discussion that would include a review of the tenure of current

Ultratech Board members and establish a timeline for value creation and management succession. On August 11, 2015, Neuberger filed a Schedule 13D attaching the August 4, 2015 letter and disclosing a 6.68% beneficial ownership of the outstanding common stock of Ultratech. Neuberger and representatives of Ultratech communicated and met in the ensuing weeks and several months thereafter.

35.     On September 28, 2015, Neuberger sent a second letter to Ultratech reiterating certain views from the August 4, 2015 letter and reserving its right to put forward candidates for the Ultratech Board or stockholder proposals if progress on its demands was not made to its satisfaction.

36.     On October 8, 2015, Defendant Zafiropoulo, met with the Chairman of a potential strategic business combination partner ("Company A"), who suggested that Ultratech and Company A explore the possibility of a strategic business combination transaction, possibly involving another potential strategic business combination partner ("Company B"). Ultratech periodically communicated with Company A through August of 2016 regarding a possible strategic transaction.

37.     On October 17, 2015, John Peeler, Chairman and CEO of Veeco, sent Zafiropoulo an email requesting to meet with him the week of November 8, 2015. Thereafter Mr. Peeler and Zafiropoulo did meet in San Jose, CA on or about November 10, 2015, to discuss views about their respective companies and the industry generally.

38.     On December 7, 2015, Ultratech and Company A entered into a mutual non-disclosure agreement. The non-disclosure agreement contained a customary standstill provision that would terminate automatically upon certain events, including in the event that Ultratech entered into a definitive agreement for the acquisition of 50% or more of its outstanding voting securities.

39.     On December 17, 2015, Ultratech entered into an engagement letter with the unnamed financial advisory firm with respect to a potential strategic business combination with Company A. This engagement subsequently terminated in December 2016 in accordance with its terms (with a tail fee payable to the financial advisory firm under certain circumstances if Ultratech

were to complete an acquisition of Company A pursuant to an agreement entered into within 12 months of such termination).

40.    On February 1, 2016, BofA was invited to a Company Board meeting to discuss market developments and strategic opportunities for the Company.  On February 2, 2016, the Company Board asked Zafiropoulo to contact BofA and instruct them to prepare a list of parties that may potentially participate in a bidding process for Ultratech, which Zafiropoulo did.

41.    On March 4, 2016, Neuberger sent another letter to the Ultratech Board and its then lead independent director, which, among other things, provided the names and biographies of two potential director candidates, Ronald Black and Beatriz V. Infante.  On March 9, 2016, Neuberger filed with the SEC an amendment to its previously filed Schedule 13D attaching the March 4, 2016 letter and disclosing beneficial ownership of 7.55% of the outstanding Ultratech common stock.

42.    On April 19, 2016, the Ultratech Board held a meeting, at which the Board requested that Zafiropoulo contact representatives of BofA and instruct them to begin an initial outreach to potential strategic acquirers and financial sponsors in Asia.  The Ultratech Board determined to start its outreach with prospects in Asia, then move on to prospects in Europe and the Middle East before finally moving on to prospects in the United States.

43.    On April 21, 2016, Neuberger submitted a notice to Ultratech nominating Dr. Black and Ms. Infante for election to the Ultratech Board at Ultratech's 2016 annual meeting of stockholders.  The next day, Ultratech issued a press release responding to Neuberger's nomination.  The press release also stated that, as part of Ultratech's continuing focus on increasing stockholder value, Ultratech was in the final stages of selecting a director candidate with relevant experience in the semiconductor capital equipment industry and related industries and/or operational experience with Ultratech's key customers.

44.    Beginning in late April 2016, at the direction of representatives of Ultratech, BofA began contacting potential strategic acquirers and financial sponsors in Asia.  In total, BofA contacted 12 prospective acquirers in Asia at or around this time, five of which were strategic acquirers and seven of which were financial sponsors.

CLASS ACTION COMPLAINT

45.     Between May 2016 and Ultratech's annual stockholder meeting on July 19, 2016, representatives of Ultratech continued to have discussions with representatives of Neuberger regarding its nomination notice and the election of directors to Ultratech's board. The Preliminary Proxy does not provide more specific information regarding these discussions.

46.     At a meeting held on May 12, 2016, the Ultratech Board discussed entering into an engagement letter with BofA.

47.     Beginning on May 20, 2016, Zafiropoulo held meetings with various potential strategic and financial sponsors in Asia regarding a potential sale of Ultratech. Zafiropoulo met with 10 such prospective acquirers, five of which were potential strategic acquirers (including "Company C"), and five of which were financial sponsors (including "Sponsor A", "Sponsor B", and "Sponsor C").

48.     On May 27, 2016, Neuberger filed a preliminary proxy statement with the SEC (which it filed in final form on June 13, 2016) related to its nomination of Black and Infante for election to the Ultratech Board.

49.     On June 3, 2016, the Company filed an 8-K disclosing that then Board member Joel F. Gemunder would not run for reelection to the Board.

50.     On June 6, 2016, Ultratech filed a preliminary proxy statement with the SEC (which it filed in final form on June 13, 2016) related to its nomination of six incumbent directors and one new director nominee, Dr. Paramesh Gopi, for election to the Ultratech Board.

51.     On June 6, 2016, discussions began with BofA to formally engage them to aid in Ultratech's sale process. The engagement letter was signed on June 13, 2016.

52.     From June 10, 2016, to August 3, 2016, Ultratech sent, negotiated and executed non-disclosure agreements with Company C, Sponsor A, Sponsor B, Sponsor C, and a fourth financial investor "Sponsor D". The non-disclosure agreements contained customary standstill provisions that would terminate automatically upon certain events, including in the event that Ultratech entered into a definitive agreement for the acquisition of 50% or more of its outstanding voting securities.

53.     In July 2016, Zafiropoulo informed the Chairman of Company A that Ultratech did not desire to continue discussions concerning a strategic transaction with Company A at the present time.  The Preliminary Proxy does not provide further details about Ultratech's decision regarding terminating discussions with Company A at this time.

54.     On July 17, 2016, Zafiropoulo was appointed a member of the business development committee.

55.     On July 19, 2016, Black and Infante were elected to Ultratech's board along with Zafiropoulo, Child, Gopi, Raney, and Richard.

56.     From August 3 to August 14, 2016, Ultratech held management presentations for Company C, Sponsor A, Sponsor B, Sponsor C and Sponsor D, with representatives of BofA in attendance.  Each of these parties was provided a copy of the Ultratech management presentation, which contained information regarding Ultratech's business and results of operations and potential transaction synergies as well as preliminary financial projections with respect to fiscal years 2016 through 2018.  During this period and thereafter, Ultratech's management responded to due diligence inquiries and engaged in numerous discussions and meetings with these parties concerning their interest in pursuing an acquisition of, or a strategic partnership with, Ultratech.  At the direction of representatives of Ultratech, representatives of BofA requested that each of these parties submit a written indication of interest to Ultratech.  None of these parties ever submitted a written indication of interest to Ultratech.  The Preliminary Proxy is silent as to the reasons, if any, that these parties provided for failing to submit a written indication of interest.

57.     On August 19, 2016, at the request of the Ultratech Board, representatives of BofA began contacting potential strategic acquirers in Europe and the Middle East.  In total, representatives of BofA contacted four such potential strategic acquirers.

58.     Beginning on August 22, 2016, at the direction of representatives of Ultratech, representatives of BofA sent non-disclosure agreements to those four potential strategic acquirers in Europe and the Middle East.  None of the four parties chose to enter into a non-disclosure agreement or continue in the process.  One of these parties expressed an interest in purchasing

CLASS ACTION COMPLAINT

1   selected assets of Ultratech.  The Preliminary Proxy is silent as to the reasons, if any, that these

2   parties provided for not entering into non-disclosure agreements.

3       59.    Also in August 2016, representatives of Ultratech provided representatives of BofA

4   with management projections for Ultratech with respect to fiscal years 2016 through 2018.

5   Subsequently, in November 2016, representatives of Ultratech provided representatives of BofA

6   with updated management projections for Ultratech with respect to fiscal years 2016 through 2018.

7   As compared to the Ultratech management projections that were provided to representatives of

8   BofA in August 2016, the Ultratech management projections that were provided to representatives

9   of BofA in November 2016, among other changes, adjusted fiscal year 2016 to reflect the results

10   of the most recent quarter and reduced forecasts with respect to fiscal year 2017 based on

11   management's judgment and the results of the most recent fiscal quarter.

12       60.    On September 21, 2016, the Ultratech Board held a special telephonic meeting,

13   with representatives of BofA.  The Ultratech Board discussed with Ultratech management and

14   representatives of BofA the management meetings that had been completed by that date with

15   interested parties and the additional meetings that had been scheduled with other interested parties.

16   The Ultratech Board also discussed with Ultratech management and representatives of BofA

17   potential strategic alternatives available to Ultratech, recent mergers and acquisitions in the

18   technology industry, recent industry consolidation, recent semiconductor equipment deal activity

19   and Ultratech's financial performance and prospects and stock trend.  During this meeting, the

20   Ultratech Board requested that representatives of BofA reach out to an additional potential

21   financial sponsor in the United States ("Sponsor E"), which representatives of BofA contacted

22   shortly thereafter.

23       61.    On September 30, 2016, in connection with an unrelated meeting, Zafiropoulo met

24   briefly with Mr. Richard D'Amore, a member of Veeco's board of directors.  At that

25   meeting, Zafiropoulo mentioned Ultratech's strategic review process and inquired into the

26   possibility of Veeco participating.

27       62.    On October 3, 2016, Ultratech entered into a non-disclosure agreement with

28   Sponsor E.  However, on October 4, 2016, after attending an Ultratech management presentation,

CLASS ACTION COMPLAINT

1    Sponsor E indicated that it was not interested in purchasing Ultratech but would be open to

2    financing a strategic acquirer

3        63.    On October 5, 2016, at the direction of the Ultratech Board, representatives of BofA

4    began contacting potential strategic acquirers in the United States.  In total, representatives of

5    BofA contacted five such potential strategic acquirers including Veeco and two other potential

6    strategic acquirers ("Company D" and "Company E").

7        64.    On October 9, 2016, Ultratech entered into a non-disclosure agreement with Veeco

8    and on October 12, 2016, representatives of Ultratech held a management presentation for Veeco,

9    with representatives of BofA in attendance.  This presentation included Ultratech management

10   projections for Ultratech for the fiscal years 2016 through 2018.

11       65.    On October 19, 2016, at the direction of the Ultratech Board, representatives of

12   BofA contacted an additional potential strategic acquirer, with which Ultratech management had

13   previously communicated regarding a potential transaction ("Company F").

14       66.    On October 20, 2016, Ultratech entered into a non-disclosure agreement with

15   Company D, and on November 2, 2016, Ultratech entered into a non-disclosure agreement with

16   Company E.

17       67.    On October 22, 2016, at Ultratech's direction, representatives of BofA requested

18   that Veeco provide a non-binding indication of interest by November 9, 2016.

19       68.    On October 24, 2016, Ultratech entered into a non-disclosure agreement with

20   Company F.

21       69.    From November 2016 through January 2017, Veeco submitted various due

22   diligence requests to Ultratech to which Ultratech responded.

23       70.    On November 11, 2016, Ultratech received a preliminary, non-binding indication

24   of interest from Veeco to acquire Ultratech.  Veeco offered $26.50 per Ultratech share, with 50%

25   in cash and 50% payable in Veeco shares of common stock, representing a 21% premium to the

26   closing price of Ultratech's common stock as of November 10, 2016.

27       71.    On November 15, 2016, representatives of BofA provided to Zafiropoulo a

28   disclosure letter to the Ultratech Board, dated November 15, 2016, describing certain of BofA

material relationships with Ultratech, Veeco and other potential acquirers, which Zafiropoulo then provided to the Ultratech Board that evening.  The Preliminary Proxy is silent as to why this information was disclosed at this time, rather than when such entities were first contacted by Ultratech.

72.     Between November 14 and December 9, 2016, at the direction of the Ultratech Board, Ultratech management provided follow-up materials to, and held additional discussions with, Veeco, Company D, Company E and Company F, including management presentations for Company D, Company E and Company F, each with the assistance of its respective legal and financial advisors.

73.     Between November 16, 2016 and November 21, 2016, at the request of the Ultratech Board, representatives of BofA requested that each of Company D, Company E and Company F submit non-binding indications of interest by December 2, 2016.  Shortly thereafter, Company D requested the deadline for submitting a non-binding indications of interest be extended to December 6, 2016, Company E requested the deadline for submitting a non-binding indications of interest be extended to December 16, 2016 and Company F requested the deadline for submitting a non-binding indications of interest be extended to December 8, 2016.  Each such request was granted by Ultratech.

74.     On December 5, 2016, the Ultratech Board held a conference call with representatives of BofA during which the board instructed representatives of BofA to again seek indications of interest from the potential bidders that had not yet submitted any indications of interest.  The Ultratech Board also instructed representatives of BofA to seek a revised indication of interest from Veeco with a higher per share price than the November 11, 2016 indication of interest from Veeco.  Representatives of BofA subsequently contacted representatives of Barclays to communicate the request for a revised indication of interest from Veeco.

75.     On December 6, 2016, Ultratech received a preliminary, non-binding indication of interest from Company D to acquire Ultratech.  Company D offered $24.00 per Ultratech share in cash.  This offer represented an 8% premium to Ultratech's closing price as of December 5, 2016.

CLASS ACTION COMPLAINT

76.    Also on or about December 6, 2016, at the request of representatives of Ultratech, representatives of BofA provided Veeco with updated Ultratech management projections with respect to fiscal years 2016 through 2018.

77.    On December 8, 2016, Company F indicated it was no longer interested in pursuing a potential transaction with Ultratech.

78.    On December 12 and 13, 2016, representatives of Veeco and representatives of Ultratech held in person due diligence meetings, with financial advisors present.

79.    During the week of December 12, 2016, at the direction of the Ultratech Board, Ultratech management provided follow-up materials to, and held additional discussions with, Veeco, Company D, and Company E, each with the assistance of its respective legal and financial advisors.

80.    On December 15, 2016, Company E indicated it was only interested in purchasing selected assets of Ultratech.  Ultratech decided not to continue discussions with Company E.

81.    Between December 19 and January 13, 2017, at the direction of the Ultratech Board, Ultratech management provided due diligence materials to, and held due diligence discussions with, Veeco and Company D, each with the assistance of its respective legal and financial advisors.

82.    On December 27, 2016, at the request of the Ultratech Board, representatives of BofA delivered a draft merger agreement to each of Veeco and Company D and requested that each company submit a revised proposal for the acquisition of Ultratech by January 13, 2017.

83.    During the first half of January 2017, Veeco continued its diligence review of Ultratech, and representatives of Ultratech and Veeco engaged in a series of business and legal diligence meetings for that purpose.

84.    On January 4, 2017, representatives of Ultratech provided financial projections for Ultratech for fiscal years 2019 through 2021 to representatives of BofA.  The Preliminary Proxy is silent as to why this information was provided to BofA at such a late date in the sales process.

85.    On January 10, 2017, Ultratech agreed to extend the deadline for Veeco to January 20, 2017 after a request to do so by Veeco.

CLASS ACTION COMPLAINT

86.    On January 13, 2017, Company D informed representatives of BofA that it would not be providing another proposal for the acquisition of Ultratech and that it was withdrawing its original proposal, which representatives of BofA communicated to the Ultratech Board.  Upon learning of Company D's withdrawal, Ultratech decided not to continue discussions with Company D.

87.    During the weeks of January 16 and January 23, 2017, at the direction of the Ultratech Board, Ultratech provided due diligence materials to, received reverse due diligence materials from, and held due diligence and reverse due diligence discussions with Veeco, each with the assistance of its respective legal and financial advisors.

88.    On January 17, 2017, Veeco provided Veeco's preliminary results for fiscal year 2016 and financial projections for fiscal years 2017 and 2018 to representatives of BofA, who then provided such projections to representatives of Ultratech.  On January 23, 2017, Veeco provided an updated forecast of the first quarter of 2017 with respect to Veeco to representatives of BofA, who then provided such updated forecast to representatives of Ultratech.

89.    On January 20, 2017, Ultratech received a revised, non-binding indication of interest of Veeco to acquire Ultratech.  Veeco offered $21.34 in cash and 0.2620 shares of Veeco common stock per Ultratech share.  Based on Veeco's closing share price on January 19, 2017, this represented a total per share value of $28.45, consisting of $21.34 in cash and $7.11 in Veeco common stock.  Included in preliminary comments to the draft merger agreement sent by Veeco, among other comments, was a request that Ultratech's directors and officers sign support agreements in favor of the merger and a request that Ultratech enter into a 30-day exclusivity agreement with Veeco.

90.    On January 23, 2017, both Company D and Company E indicated they were not interested in pursuing a potential acquisition at $29.00 per share.

91.    On January 23, 2017, Ultratech received a revised offer letter from Veeco including a revised, non-binding indication of interest from Veeco to acquire Ultratech for $21.75 in cash and 0.2675 shares of Veeco common stock per Ultratech share.  Based on Veeco's closing share price on January 20, 2017, this represented a total per share value of $29.00, consisting of $21.75

in cash and $7.25 in Veeco common stock.  The revised offer letter also included a request that Ultratech enter into a separate exclusivity agreement and countersign the offer letter.

92.     On January 25, 2017, at the direction of the Ultratech Board, representatives of BofA provided Veeco with Ultratech's comments to Veeco's revised offer letter and the exclusivity agreement provided by Veeco.  Veeco did not respond to those comments.  The Preliminary Proxy does not discuss the impact of Veeco's failure to respond to those comments.

93.     Between January 24, 2017 and February 1, 2017, Veeco and Ultratech negotiated the definitive merger agreement and ancillary documents.

94.     On or about January 27, 2017, Ultratech provided representatives of BofA with actual financial results for Ultratech with respect to fiscal year 2016 and with updated financial information for Ultratech with respect to Ultratech's most recently completed quarter.

95.     Also on January 27, 2017, Veeco and Ultratech provided each other with updates regarding Veeco's due diligence and Ultratech's reverse due diligence processes, each with the assistance of its respective financial advisors.

96.     From January 27, 2017 to January 30, 2017, Peeler, Zafiropoulo and Child discussed the terms of change in control severance agreements that Ultratech was considering approving for certain of its executives as well as the terms and conditions of equity awards that the compensation committee of the Ultratech Board had been contemplating pursuant to the Ultratech 1993 Stock Option/Stock Issuance Plan.  These requests were resolved to the satisfaction of Ultratech and Veeco.  The Preliminary Proxy does not provide further information as to the specific nature of these comments.

97.     On January 30, 2017, Veeco and Ultratech entered into an additional non-disclosure agreement regarding information provided by Veeco to Ultratech as part of Ultratech's reverse due diligence process.  Veeco then provided Ultratech with additional due diligence materials.

98.     On January 31, 2017, the compensation committee of the Ultratech Board approved certain change in control severance agreements for certain executives of Ultratech, other than for Zafiropoulo and Wright who were already parties to employment agreements with Ultratech. The compensation committee of the Ultratech Board also approved the grant of restricted stock

CLASS ACTION COMPLAINT

1  unit awards under Ultratech's 1993 Stock Option/Stock Issuance Plan to certain employees,

2  including Ultratech's executive officers, that cover, in the aggregate, 338,000 shares of Ultratech

3  common stock.

4      99.    Also on January 31, 2017, representatives of BofA provided to Ultratech an

5  updated disclosure letter describing certain of BofA's material relationships with Ultratech and

6  Veeco.  The Preliminary Proxy is silent as to why such an updated disclosure letter was provided

7  so late in the sales process.

8      100.    On February 1, 2017, the Ultratech Board held a special telephonic meeting to

9  review the terms and conditions of the proposed transaction with Veeco with financial and legal

10  advisors in attendance.  At this meeting, BofA delivered to Ultratech's board an oral opinion, which

11  was confirmed by the delivery of a written opinion on February 1, 2017, to the effect that, as of

12  that date and based on and subject to various assumptions and limitations described in its opinion,

13  the merger consideration to be received in the merger by holders of Ultratech common stock (other

14  than Veeco, Merger Subsidiary and holders of dissenting shares), was fair, from a financial point

15  of view, to such holders.

16      101.    On February 2, 2017, the Proposed Acquisition was executed by Veeco and the

17  Company and a joint press release was issued.

18  ***The Proposed Acquisition***

19      102.    On February 2, 2017, Veeco and Ultratech issued a joint press release announcing

20  that Ultratech had agreed to be acquired by Veeco in the Proposed Acquisition.  The press release

21  states in relevant part:

22      Plainview, New York and San Jose, California—February 2, 2017—Veeco
        Instruments Inc. (Nasdaq: VECO), a global leader of advanced thin film etch and
23      deposition process equipment, and Ultratech, Inc. (Nasdaq: UTEK), a leading
        supplier of lithography, laser-processing and inspection systems used to
24      manufacture semiconductor devices and LEDs, today announced that they have
        signed a definitive agreement for Veeco Instruments Inc. ("Veeco") to acquire
25      Ultratech, Inc. ("Ultratech").  The Boards of Directors of both Veeco and Ultratech
        have unanimously approved the transaction.

26

27      Ultratech shareholders will receive (i) $21.75 per share in cash and (ii) 0.2675 of a
        share of Veeco common stock for each Ultratech common share outstanding.
28      Based on Veeco's closing stock price on February 1, 2017, the transaction
        consideration is valued at approximately $28.64 per Ultratech share.  The implied
        total transaction value is approximately $815 million and the implied enterprise

value is approximately $550 million, net of Ultratech's net cash balance as of December 31, 2016. Post transaction, it is projected that Ultratech shareholders will own approximately 15 percent of the combined company.

Ultratech is a recognized leader of lithography products for Advanced Packaging applications and for LEDs and is a pioneer for laser spike anneal technology used for the production of semiconductor devices. In addition, the company offers wafer inspection solutions leveraging its proprietary coherent gradient sensing (CGS) technology which address a wide variety of semiconductor applications.

"The strategic combination will establish Veeco as a leading equipment supplier in the high growth Advanced Packaging industry. Ultratech's leadership in lithography together with Veeco's Precision Surface Processing (PSP) solutions form a strong technology portfolio to address the most critical Advanced Packaging applications. We believe our complementary end market exposure and customer relationships will create the ideal platform to accelerate growth," said John R. Peeler, Veeco's Chairman and Chief Executive Officer. "Ultratech is a great fit with our strategy to profitably grow our business and diversify our revenue. We expect this transaction to be immediately accretive to adjusted EBITDA and non-GAAP EPS."

Ultratech Chairman and Chief Executive Officer, Arthur W. Zafiropoulo said, "Both companies have a strong heritage of developing innovative and cutting-edge technologies. The combined company will create a formidable team to execute against growth opportunities and deliver significant value to customers and shareholders."

Veeco expects to realize approximately $15 million in annualized run rate synergies within 24 months after closing, to be achieved through increased efficiencies and leveraging the scale of the combined businesses. The combined company is expected to have an efficient balance sheet, benefiting from the deployment of excess cash.

The transaction is expected to close in the second calendar quarter of 2017, subject to approval by Ultratech shareholders, regulatory approvals in the U.S. and other customary closing conditions.

***The Inadequate Merger Consideration***

103.    Significantly, analyst expectations, the Company's strong market position, extraordinary growth, synergistic value to Veeco, and positive future outlook, establish the inadequacy of the merger consideration.

104.    First, the compensation afforded under the Proposed Acquisition to Company stockholders significantly undervalues the Company. The proposed valuation does not adequately reflect the intrinsic value of the Company. Moreover, the valuation does not adequately take into consideration how the Company is performing. As stated by Defendant Zafiropoulo in the conference call announcing the deal, "It's been a terrific year. And I see the packaging market continuing to increase…. And we expect this to grow over the years in the future and it wouldn't

CLASS ACTION COMPLAINT

surprise me as I've said over the past several years that this potential could go to 60% in packaging through bumps over the next several years.  And so the growth potential is very large, and we see it growing as we speak now.  So, again, this is a long-term strategy and one that has terrific legs, and we expect it to continue for quite some time."

105.    Next, analyst coverage indicates a high target above the deal price, $30.00 a share.

106.    In addition to simply undervaluing the Company, the Proposed Acquisition does not take into account the synergistic benefits that Ultratech will bring to Veeco.  These values are touched upon explicitly in the merger press release, with John R. Peeler, Veeco's Chairman and Chief Executive Officer, stating "The strategic combination will establish Veeco as a leading equipment supplier in the high growth Advanced Packaging industry.  Ultratech's leadership in lithography together with Veeco's Precision Surface Processing (PSP) solutions form a strong technology portfolio to address the most critical Advanced Packaging applications.  We believe our complementary end market exposure and customer relationships will create the ideal platform to accelerate growth," "Ultratech is a great fit with our strategy to profitably grow our business and diversify our revenue.  We expect this transaction to be immediately accretive to adjusted EBITDA and non-GAAP EPS."

107.    These synergistic benefits were also addressed in the conference call and presentation on February 2, 2017.  The presentation materials note Veeco expects to realize $15 million in annualized synergies within 2 years post-close and the deal will be significantly accretive to non-GAAP EPS in the first year.  They are also touched on in the afore-mentioned conference call by Veeco's CFO, Brian White, who stated, "[w]e expect Ultratech to add approximately $16 million of revenue per quarter at approximately 70% non-GAAP gross margins.  We expect the business to be accretive to earnings in the first full quarter following acquisition close and that it will support our target market of 30% non-GAAP operating market within three full quarters."

108.    Moreover, post-closure, Ultratech shareholders will own only 15% of the combined companies despite accounting for approximately 37% of aggregate sales (at current levels).

109.   It is clear from these statements and the facts set forth herein that this deal is designed to maximize benefits for Veeco and Veeco stockholders at the expense of Ultratech and Ultratech stockholders, which clearly indicates that Ultratech stockholders were not an overriding concern in the formation of the Proposed Acquisition.

***Potential Conflicts of Interest***

110.   In addition, the deal itself may have tainted by the self-interest of the Individual Defendants.   Certain insiders stand to receive financial benefits as a result of the Proposed Acquisition.  In fact, upon the consummation of the Proposed Acquisition, Defendant Zafiropoulo and other Company insiders will receive large change of control paydays which would not normally occur, thus tainting their motivations in approving it:

| Named Executive Officer | Cash ($)(1) | Equity ($)(2) | Perquisites/ Benefits(3) | Total(4) |
|---|---|---|---|---|
| Arthur W. Zafiropoulo | $    4,077,004 | $    3,125,970 | $    1,137,000 | $    8,339,974 |
| Bruce R. Wright | $    1,806,596 | $    2,024,708 | $    938,000 | $    4,769,304 |
| Dave Ghosh | $    435,550 | $    1,896,913 | $    — | $    2,332,463 |
| Tammy D. Landon | $    394,569 | $    1,810,383 | $    — | $    2,204,952 |

111.   Thus, while the Proposed Acquisition is not in the best interests of Ultratech's stockholders, it will produce lucrative benefits for the Company's officers and directors.

***The Materially Misleading and/or Incomplete Preliminary Proxy***

112.   On March 13, 2017, Ultratech filed with the SEC a materially misleading and incomplete Preliminary Proxy that failed to provide the Company's stockholders with material information and/or provides them with materially misleading information critical to the total mix of information available to the Company's stockholders concerning the financial and procedural fairness of the Proposed Acquisition.

*Omissions and/or Material Misrepresentations Concerning Ultratech's Financial Projections*

113.   The Preliminary Proxy fails to provide material information concerning financial projections provided by Ultratech's management, reviewed with Ultratech and relied upon by BofA in its analyses.  Courts have uniformly stated that "projections … are probably among the most highly-prized disclosures by investors.  Investors can come up with their own estimates of

discount rates or [] market multiples.  What they cannot hope to do is replicate management's inside view of the company's prospects." *In re Netsmart Techs., Inc. S'holders Litig*., 924 A.2d 171, 201-203 (Del. Ch. 2007).

114.    The Preliminary Proxy discloses several non-GAAP accounting metrics; however, providing these non-GAAP metrics without reconciling the non-GAAP projections to GAAP measures makes the provided disclosures materially incomplete and misleading.

115.    Because of the non-standardized and potentially manipulative nature of non-GAAP measures, when a company discloses information in a Preliminary Proxy that includes non-GAAP financial measures, the Company must also disclose comparable GAAP measures and a quantitative reconciliation of forward-looking information.  17 C.F.R. § 244.100.

116.    Additionally, with respect to Veeco, the Preliminary Proxy fails to disclose the following projections:

> (i)     Income Taxes;
>
> (ii)    Restructuring Charges;
>
> (iii)   Interest;
>
> (iv)    Depreciation and amortization;
>
> (v)     Asset impairment charges; and
>
> (vi)    Stock based compensation.

117.    Without accurate projection data presented in the Preliminary Proxy, Plaintiffs and other stockholders of Ultratech are unable to properly evaluate the Company's true worth, the accuracy of BofA's financial analyses, or make an informed decision whether to vote their Company stock in the Proposed Acquisition.

*Omissions and/or Material Misrepresentations Concerning the Sales Process leading up to the Proposed Acquisition*

118.    Specifically, the Preliminary Proxy fails to provide material information concerning the process conducted by the Company and the events leading up to the Proposed Acquisition.  In particular, the Preliminary Proxy fails to disclose:

a.  The amount of BofA's fee that is contingent on the consummation of the Proposed Acquisition.  The Preliminary Proxy states, "Ultratech has agreed to pay BofA Merrill Lynch for its services in connection with the merger an aggregate fee currently estimated to be approximately $12 million, a portion of which was payable in connection with its opinion and a significant portion of which is contingent upon the completion of the merger."  Preliminary Proxy at 82.  Resolution of this issue goes directly to potential conflicts of interest regarding BofA.

b.  The interest shown by both Company E and a potential strategic acquirer in purchasing certain assets of the Company.  Preliminary Proxy at 62, 66, 72.

c.  The unnamed financial advisor that Ultratech entered into an engagement letter with in December 2015 with respect to a potential strategic business combination with Company A and the tail fee terms to this advisor associated with any deal reached Company A.

d.  The specific reasons for the late date at which BofA disclosed certain information regarding its relationship with Veeco, and the effects, if any, it had on the sales process.

e.  The basis for Ultratech's decision regarding terminating discussions with Company A in July 2016.

*Omissions and/or Material Misrepresentations Concerning The Financial Analyses by BofA*

119.    In the Preliminary Proxy, BofA describes its fairness opinion and the various valuation analyses performed to render such opinions.  However, the description fails to include necessary underlying data, support for conclusions, or the existence of, or basis for, underlying assumptions.  Without this information, one cannot replicate the analyses, confirm the valuations or evaluate the fairness opinion.

120.    For example, the Preliminary Proxy does not disclose material details concerning the analyses performed by BofA in connection with the Proposed Acquisition, including (among other things):

    a.    *Selected Publicly Traded Companies Analysis*:

        With respect to Needham's Selected Companies Analysis, the Preliminary Proxy fails to disclose:

            i.    The objective selection criteria and the observed company-by-company pricing multiples and financial metrics examined.

    b.    *Discounted Cash Flow Analysis*

        With respect to Needham's *Discounted Cash Flow Analysis*, the Preliminary Proxy fails to disclose:

            i.    The inputs and assumptions utilized by BofA to derive the discount rate range of 12%-15% used in the analysis.

            ii.    The terminal values calculated.

            iii.    The basis for the applying a perpetuity growth rate range of 1.0%-3.0%.

    c.    *Selected Precedent Transactions Analysis*

        With respect to Needham's *Selected Transactions Analysis*, the Preliminary Proxy fails to disclose:

            i.    The objective selection criteria and the observed transaction by transaction multiples and metrics examined.

            ii.    The individual transaction values and dates for each of the selected transactions.

            iii.    Why NTM EBITDA was used as a metric when the figures for NTM EBITDA were not available or meaningful for many of the listed exemplar transactions.

121.    Without the omitted information identified above, Ultratech's public stockholders are missing critical information necessary to evaluate whether the proposed consideration truly maximizes stockholder value and serves their interests.  Moreover, without the key financial

information and related disclosures, Ultratech's public stockholders cannot gauge the reliability of the fairness opinion and the Board's determination that the Proposed Acquisition is in their best interests.

## FIRST COUNT

## Violations of Section 14(a) of the Exchange Act

## (Against All Defendants)

122.    Plaintiffs repeat all previous allegations as if set forth in full herein.

123.    Defendants have disseminated the Preliminary Proxy with the intention of soliciting stockholders to vote their shares in favor of the Proposed Acquisition.

124.    Section 14(a) of the Exchange Act provides, "[n]o solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading."

125.    The Preliminary Proxy was prepared in violation of Section 14(a) because it is materially misleading in numerous respects and omits material facts, including those set forth above.  Moreover, in the exercise of reasonable care, Defendants knew or should have known that the Preliminary Proxy is materially misleading and omits material facts that are necessary to render them non-misleading.

126.    The Individual Defendants had actual knowledge or should have known of the misrepresentations and omissions of material facts set forth herein.

CLASS ACTION COMPLAINT

127.    The Individual Defendants were at least negligent in filing a Preliminary Proxy that was materially misleading and/or omitted material facts necessary to make the Preliminary Proxy not misleading.

128.    The misrepresentations and omissions in the Preliminary Proxy are material to Plaintiffs and the Class, and Plaintiffs and the Class will be deprived of their entitlement to decide whether to vote their shares on the basis of complete information if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Acquisition.

## SECOND COUNT

## Violations of Section 20(a) of the Exchange Act

## (Against all Individual Defendants)

129.    Plaintiffs repeat all previous allegations as if set forth in full herein.

130.    The Individual Defendants were privy to non-public information concerning the Company and its business and operations via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or should have known that the Preliminary Proxy was materially misleading to Company stockholders.

131.    The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the materially false and misleading statements complained of herein.  The Individual Defendants were aware or should have been aware that materially false and misleading statements were being issued by the Company in the Preliminary Proxy and nevertheless approved, ratified and/or failed to correct those statements, in violation of federal securities laws.  The Individual Defendants were able to, and did, control the contents of the Preliminary Proxy.  The Individual Defendants were provided with copies of, reviewed and approved, and/or signed the Preliminary

CLASS ACTION COMPLAINT

Proxy before its issuance and had the ability or opportunity to prevent its issuance or to cause it to be corrected.

132. The Individual Defendants also were able to, and did, directly or indirectly, control the conduct of Ultratech's business, the information contained in its filings with the SEC, and its public statements. Because of their positions and access to material non-public information available to them but not the public, the Individual Defendants knew or should have known that the misrepresentations specified herein had not been properly disclosed to and were being concealed from the Company's stockholders and that the Preliminary Proxy was misleading. As a result, the Individual Defendants are responsible for the accuracy of the Preliminary Proxy and are therefore responsible and liable for the misrepresentations contained herein.

133. The Individual Defendants acted as controlling persons of Ultratech within the meaning of Section 20(a) of the Exchange Act. By reason of their position with the Company, the Individual Defendants had the power and authority to cause Ultratech to engage in the wrongful conduct complained of herein. The Individual Defendants controlled Ultratech and all of its employees. As alleged above, Ultratech is a primary violator of Section 14 of the Exchange Act and SEC Rule 14d-9. By reason of their conduct, the Individual Defendants are liable pursuant to section 20(a) of the Exchange Act.

WHEREFORE, Plaintiffs demand injunctive relief, in their favor and in favor of the Class, and against the Defendants, as follows:

A. Ordering that this action may be maintained as a class action and certifying Plaintiffs as the Class representatives and Plaintiffs' counsel as Class counsel;

B. Enjoining the Proposed Acquisition;

C. In the event defendants consummate the Proposed Acquisition, rescinding it and setting it aside or awarding rescissory damages to Plaintiffs and the Class;

CLASS ACTION COMPLAINT

D.   Directing defendants to account to Plaintiffs and the Class for their damages sustained because of the wrongs complained of herein;

E.   Awarding Plaintiffs the costs of this action, including reasonable allowance for Plaintiffs' attorneys' and experts' fees; and

F.   Granting such other and further relief as this Court may deem just and proper.

### **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a jury on all issues which can be heard by a jury.

Dated: March 22, 2017                         BRODSKY & SMITH, LLC

By: _____
Evan J. Smith (SBN242352)
9595 Wilshire Boulevard, Suite 900
Beverly Hills, CA 90212
Telephone:    (877) 534-2590
Facsimile:     (310) 247-0160

*Attorneys for Plaintiffs*

- 29 -
CLASS ACTION COMPLAINT